UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY

SHAUNNE OLSON,

          Plaintiff,                   Case No. 4:06-CV-0154-SEB-WGH

vs.

HMS WestPac EXPRESS, INC.,

          Defendant.
_____/

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

       NOW COMES Plaintiff, by and through counsel undersigned, and hereby submits the following Proposed Findings of Fact and Conclusions of Law as follows:

**FINDINGS OF FACT**:

       1.      On August 9, 2005, Plaintiff Shaunne Olson was offered the position of QMED by HMS-Westpac Express, Inc. (Exhibit 5, Response of Defendant to Plaintiff's Request for Production of Documents).

       2.      Plaintiff Shaunne Olson was hired by Defendant on August 17, 2006 (Exhibit 5, Response of Defendant to Plaintiff's Request for Production of Documents).

       3.      The Shipping Articles indicate that Plaintiff Shaunne Olson worked for the Defendant on the following dates:

- ▸ August 18, 2005 through September 29, 2005
- ▸ November 11, 2005 through December 23, 2005
- ▸ January 22, 2006 through February 23, 2006

1

&#9656;    March 22, 2006 through March 25, 2006
&#9656;    May 24, 2006 through June 13, 2006

In addition, all of the Shipping Articles indicate that a seaman shall be served at least three meals a day that total at least 3,100 calories, including adequate water and adequate protein, vitamins and minerals in accordance with the United States Recommended Daily Allowance (Exhibit 5, Response of Defendant to Plaintiff's Requests for Production of Documents).

4.      On September 26, 2005, Plaintiff Shaunne Olson reported to the ship's master of the Westpac Express that he fell down a flight of stairs and sustained a small cut on his finger and back pain. Mr. Olson was given hydrogen peroxide, Neosporin, and a band-aid for his cut. He complained of an upset stomach so he was given Malox.  No other treatment was given nor was Plaintiff told to see a doctor (Exhibit 5, Response of Defendant to Plaintiff's Requests for Production of Documents).

5.      The Hornblower Marine Services/Westpac position description for QMED states that the essential duties and responsibilities of the position are as follows:

&#9656;    Participate in the safe operation of vessel as required within USCG regulations.
&#9656;    Participate in drills with marine and non-marine crew as directed by the master or with engineering crew.
&#9656;    Report on problems to the chief engineer immediately.
&#9656;    Maintain a safe and clean engine room.
&#9656;    Properly process and pump sewage and oily water tanks as directed.
&#9656;    Make emergency repairs when needed.
&#9656;    Perform daily/weekly/monthly preventative maintenance as directed.
&#9656;    Perform all other duties and responsibilities normally expected of a vessel's QMED.
&#9656;    Present a neat and alert personal appearance
(Exhibit 5, Response of Defendant to Plaintiff's Requests for Production of Documents; Deposition of Dr. Florek, Exhibit C).

6.      The Merchant Mariner Physical Examination Report filled out by Dr. Michael

2

Florek provides that the physician completing the examination should ensure that the mariner's are of sound health, have no physical limitations that would hinder or prevent performance of duties, are physically and mentally able to stay alert for 4-6 hour shifts, and are free from any medical conditions that pose a risk of sudden incapacitation, which would affect operating, or working on vessels.  In addition, the form also lists a partial list of physical demands for performing the duties of a merchant mariner in most segments of the maritime industry as follows:

> ► Working in cramped spaces on rolling vessels.
> ► Maintaining balance on a moving deck.
> ► Rapidly donning an exposure suit.
> ► Stepping over door sills of 24" in height.
> ► Opening and closing watertight doors that may weigh up to 56 lbs.
> ► Pulling heavy objects, up to 50 lbs. in weight, distances of up to 400'.
> ► Climbing steep stairs or vertical ladders without assistance.
> ► Participating in firefighting and lifesaving efforts, including wearing a self-contained breathing apparatus (SCBA) and lifting/controlling fully charged fire hoses (Exhibit B, Attachment to Dr. Michael Florek deposition).

7.      Dr. Michael Florek, D.O., filled out a Merchant Mariner Physical Examination Report with respect to Shaunne Olson on October 18, 2005.  Considering the findings in the examination and noting the physical demands that may be placed upon the applicant, Dr. Florek signed the report stating that he considered Shaunne Olson to be competent to work as a merchant mariner (Deposition Exhibit A attachment to Dr. Michael Florek's deposition).

8.      Dr. Michael Florek is board certified in family practice and has been Mr. Olson's family doctor since November 17, 2003 (Deposition of Dr. Michael Florek at pp. 4, 6, and 22).

9.      Plaintiff presented on May 23, 2005, to Dr. Florek complaining of low back pain.

Mr. Olson stated that he saw a doctor in Florida a week previous who took him off work and he

felt his pain was better. One that visit Dr. Florek did not give any treatment to Mr. Olson for his

low back, he had good range of motion in all directions, and his gait was normal (Deposition of

Dr. Michael Florek, pp. 7-8).

10.     Dr. Florek saw Mr. Olson on May 24, 2005, and Mr. Olson stated he was not

quite ready to return to work.  The physical examination was basically unchanged although

Plaintiff had tight hamstrings due to cerebral palsy.  Though Mr. Olson's hamstrings were tight,

Dr. Florek testified this was not disabling and Plaintiff's cerebral palsy had no effect on his

ability to work (Dr. Michael Florek deposition pp. 8-9).

11.     Dr. Florek saw Mr. Olson on May 31, 2005, and at that time Mr. Olson felt he

was ready to return to work.  Physical examination of Mr. Olson demonstrated normal range of

motion except for the tight hamstrings which was normal for Mr. Olson.  Dr. Florek released Mr.

Olson to return to work without restrictions (Deposition of Dr. Michael Florek p. 10).

12.     Dr. Florek saw Mr. Olson on July 5, 2005.  That visit was for treatment of

hemorrhoids and to stop smoking. During that visit Mr. Olson did not complain of any back or

musculoskeletal pain (Dr. Michael Florek deposition p. 11).

13.     Dr. Florek saw Mr. Olson on October 18, 2005, to perform an employment

physical.  At that time, Dr. Florek stated that Mr. Olson did not have any complaints of back pain

and after the physical examination he assessed Mr. Olson as fit for duty (Dr. Michael Florek

deposition p. 11).

14.     Dr. Florek testified that the physical examination on October 18, 2005, was

normal.  Mr. Olson had tightening of his hamstring musculature, but was at his baseline.  Dr.

4

Florek testified that he saw nothing that would restrict Mr. Olson's ability to work as a merchant mariner.  Dr. Florek recognized the physical examination report as being in his writing with his signature on it and he further stated that he checked off all the boxes (Dr. Michael Florek deposition pp. 12-13).

15.    Dr. Florek testified that under musculoskeletal system he checked off amputations 'no', impaired range of motion 'no', and impaired balance or coordination 'no'. Dr. Florek further testified that this was a <u>misread on his part</u>, as Mr. Olson does not have normal range of motion as he has tightening of the hamstring musculature more than what the average person would have (Dr. Michael Florek deposition p. 14).

16.    However, Dr. Florek testified that the tightening of the hamstrings of Mr. Olson was considered to be his baseline, and was not a disabling condition, nor would it prevent him from working onboard a ship.  Furthermore, Dr. Florek testified that he was <u>aware</u> when he filled out this form that he had seen Mr. Olson in the past for a back injury in May 2005. Dr. Florek testified that he did not comment on the prior back injury, because he believed that the <u>form did not ask</u> about previous back injuries (Dr. Michael Florek deposition pp. 14-15).

17.    Dr. Florek testified at the time of his examination when considering the physical demands that would be placed upon Mr. Olson, he believed that Mr. Olson was <u>competent and fit for duty</u>.  In addition, Dr. Florek testified that as of his exam of October 18, 2005, there was nothing that would have caused him any concern about Mr. Olson returning to work as a merchant mariner (Dr. Michael Florek deposition pp. 15-16).

18.    Dr. Florek next saw Mr. Olson on June 19, 2006.  At that time, Mr. Olson had questions about a possible back injury on May 25, when he was lifting a welder.  Dr. Florek

testified that Mr. Olson stated that he had only been able to work three days out of the last 23 and was on pain medication and anti-inflammatories.  At that visit, Mr. Olson's range of motion of lumbar spine was restricted in all directions, which was more than usual for him.  Dr. Florek diagnosed Mr. Olson as having a lumbar strain and spasm at that time, and recommended that he be referred to physical therapy (Dr. Michael Florek deposition pp. 17-18).

19.     Dr. Florek next saw Mr. Olson on June 27, 2007.  At that time he was status post-surgery done by neurosurgeon Dr. Morris for an L4/5 laminectomy and S1.  Dr. Florek testified that Mr. Olson came to him for other problems that date and that his back pain was being followed by Dr. Morris (Dr. Florek deposition p. 19).

20.     Dr. Florek was asked whether or not the lifting incident on May 25, 2006, when Mr. Olson lifted the welder and injured his back caused or contributed in whole or in part to his lumbar strain and/or herniated disc, and Dr. Florek testified that it certainly could have, and he would defer to the other specialists who have treated Mr. Olson (Dr. Florek deposition pp. 20-21).

21.     Dr. Florek testified that on the Merchant Mariner Physical Examination Report where it says 'musculoskeletal system', one is not supposed to check off the box yes or no, as that is just a heading and is substantiated if you look at the other headings going all the way up to the top.  In further answer, Dr. Florek testified that when he looks at the form, a mark was not required next to musculoskeletal system (Dr. Florek deposition pp. 33-34).

22.     Dr. Florek testified that at the time of Plaintiff's October 2005 physical, he appeared to be physically fit and in good physical condition (Dr. Florek deposition p. 37).

23.     In looking at the job description of QMED which Defendant provided and was

6

which was marked as a Exhibit C at Dr. Florek's deposition, Dr. Florek testified that there was nothing in that job description which Mr. Olson would not have been able to perform at the time of his physical (Dr. Florek deposition p. 38).

24.     With respect to the re-employment physical exam of October 2005, Dr. Florek testified that he would have expected Mr. Olson to do repetitive standing, walking, lifting, turning, twisting, bending as needed but he was not certain if he would be able to lift 100 pounds, as it would depend on whether or not he was lifting it by himself or with help, whether he was twisting, or whether he was in an extended position, etc. (Dr. Florek deposition pp. 38-40).

25.     In terms of lifting 100 pounds in an awkward or contorted position, it was Dr. Florek's opinion that it would be bad for anyone to lift in that position (Dr. Florek deposition p. 41).

26.     In his October 18, 2005, Merchant Mariner Physical Examination Report, Dr. Florek testified that he certified Mr. Olson as being competent to perform his job.  Dr. Florek further testified that Mr. Olson's employer did not send him any specific job description which included weight limitations, etc.  (Dr. Florek deposition pp. 41-42).

27.     Dr. Florek testified that in looking through his file he found a Coast Guard document which had a partial list of physical demands for performing the duties of a merchant mariner.  The form stated that an individual has to work in cramped space on rolling vessels; maintain balance on a moving deck; rapidly don an exposure suit; step over door sills of 24" in height, open and closing watertight doors that weight up to 56 lbs.; pull heavy objects up to 50 lbs. in weight; distances of up to 400'; climb steep stairs or vertical ladders without assistance; and participate in firefighting and life saving efforts, including wearing a self contained breathing

7

apparatus; and lift and controll fully charged fire hoses.  After reading the list of physical

demands that was required of a merchant mariner, at the time of the physical examination of

October 18, 2005, Dr. Florek testified that he believed Mr. Olson was <u>competent</u> to perform

those duties (Dr. Florek deposition pp. 43-44).

       28.     Finally, Dr. Florek testified at his deposition that the Merchant Mariner Physical

Examination Report of October 2005, was filled out by him, signed by him, Mr. Olson did not

sign the form, if he did not agree with the history or answers he was given by Mr. Olson, he had

the ability to look in his file, and Dr. Florek admitted he could have checked off a different box

or wrote something else.  As of October 18, 2005, Dr. Florek testified that Mr. Olson was

competent to perform the job of QMED (Dr. Florek deposition p. 50).

       29.     Shaunne Olson underwent a Merchant Mariner Physical Examination with

Dr. Florek on October 18, 2005 (Affidavit of Shaunne Olson dated December 14, 2007).

       30.     The Merchant Mariner Physical Examination with Dr. Florek on October

18, 2005, was not undergone in conjunction with any offer of employment by the Defendant

HMS Westpac Express, Inc., and/or Hornblower Marine Services, Inc. (Affidavit of Shaunne

Olson dated December 14, 2007).

       31.     Shaunne Olson was offered employment with Defendant on August 9, 2005, and

his official date of hire with the Defendant was August 17, 2005 (Affidavit Shaunne Olson dated

December 14, 2007).

       32.     Undergoing a pre-employment physical examination was not a condition of

Defendant's offer of employment to Shaunne Olson (Affidavit of Shaunne Olson dated

December 14, 2007; also see No. 1 above and referenced exhibit to Offer of Employment).

33.     While employed by the Defendant on or about September 26, 2005, Mr. Olson recalls falling down a flight of stairs where he sustained a small cut on his finger and had some back pain.  Thereafter, Mr. Olson left Defendant's vessel on or about September 29, 2005, without any medical attention to his back (Affidavit of Shaunne Olson dated December 14, 2007).

34.     Mr. Olson cannot recall whether the physical examination of October 18, 2005, was to renew his license or to obtain a fit for duty so that he could return to the vessel following his earlier incident which occurred on September 26, 2005. At the time of the October 18, 2005 physical exam, Mr. Olson did not believe that he had any impaired range of motion or musculoskeletal problem that would have prevented him from working (Affidavit of Shaunne Olson dated December 14, 2007).

35.     According to the October 18, 2005 physical exam, Dr. Florek specifically asked Mr. Olson if he was having any low back complaints or musculoskeletal impaired range of motion on that particular date, which he did not, and Mr. Olson felt he was capable of working as QMED.  Furthermore, at the time of the examination, Dr. Florek was aware of Mr. Olson's prior back complaints as he treated Mr. Olson in May 2005, and released him fit for duty to return to a vessel, and Dr. Florek was aware of Mr. Olson's cerebral palsy (Affidavit of Shaunne Olson dated December 14, 2007).

36.     On October 18, 2005, Dr. Florek performed a full physical examination of Mr. Olson, had Mr. Olson's medical chart in front of him, and found Mr. Olson competent and fit for duty to return to work as a merchant mariner per Coast Guard requirements (Affidavit of Shaunne Olson dated December 14, 2007).

37.     During the course of the physical examination of October 18, 2005, Dr. Florek went through a list of physical impairments or medical conditions with Mr. Olson, but only asked was he suffering from any of those conditions at the time of that particular visit and did not specifically ask if he was suffering from any of these conditions in the past (Affidavit of Shaunne Olson dated December 14, 2007).

38.     Mr. Olson testified that during the course of his physical with Dr. Florek, he did not deliberately or intentionally withhold any medical information, answered the questions that Dr. Florek asked, and was never asked to sign the Merchant Mariner Physical Examination Report by the Defendant (Affidavit of Shaunne Olson dated December 14, 2007).

39.     At the time of the October 18, 2005, physical examination with Dr. Florek, Mr. Olson was already an employee of the Defendant and the examination of October 18, 2005, had nothing to do with Defendant's hiring decision (Affidavit of Shaunne Olson dated December 14, 2007).

40.     On October 18, 2005, Dr. Florek found Plaintiff fit for duty and he returned to work with Defendant on or about November 5, 2005 (Affidavit of Shaunne Olson dated December 14, 2007).

41.     Mr. Olson testified that while he did have some prior back treatment and complaints of pain in the past prior to this injury, he did not believe that the injury he sustained in May 2006 was related to his prior complaints, as this was much more severe, and he did not need just chiropractic maintenance to deal with the pain like he had in years past.  Furthermore, Mr. Olson testified that he was never told prior to this injury, that he had any herniated discs in his back that required surgical treatment.  In fact, Dr. Florek found Mr. Olson fit for duty on May 31,

10

2005, and October 18, 2005 (Affidavit of Shaunne Olson dated December 14, 2007).

42.     Gregory Brown, Vice President of Marine Operations for Hornblower Marine Services and HMS Westpac testified  on November 8, 2007, at the time of the Evidentiary Hearing.  Mr. Brown testified in Court that the Merchant Marine Physical Examination Report which Dr. Florek filled out is a Coast Guard form which he is required to utilize for preemployment (Testimony of Brown at p. 5).

43.     Mr. Brown testified that the form which Dr. Florek filled out goes back to him before he hires an individual and it is part of the preemployment packet along with the other required documents (Testimony of Brown at p. 7).

44.     Mr. Brown testified that had the form been marked 'yes' next to 'musculoskeletal', that would have been red flag and given him reason to follow up (Testimony of Brown at p. 7).

45.     Mr. Brown testified that in terms of finding out if an individual is capable of working, he would rely upon a doctor's opinion as to whether or not an individual could work without injuring themselves (Testimony of Brown p. 12).

46.     With respect to how many people a year Defendant turns down for employment who check off that they have had a past musculoskeletal problem, Mr. Brown was not aware of this number and stated that he did not know if they kept any such records (Testimony of Brown pp. 12-13).

47.     Mr. Brown testified that assuming Mr. Olson had seen Dr. Florek for eight days between May 23 and May 31, 2005, for back pain, and the doctor returned him to work after that point in time and there was no other indication of other treatment since then, that would not have

caused him any concern in hiring Mr. Olson as long as the doctor released him fit for duty. Mr.

Brown specifically stated he probably would have defaulted to what the doctor's

recommendation was (Testimony of Brown pp. 13-15).

48.     While Mr. Brown testified that had he known Mr. Olson had cerebral palsy as a

child, had at least one workers' comp claim for his back, and had been treated for back

complaints since at least 1999, that this information might have caused him some concern in the

hiring process, Mr. Brown never specifically testified that he would not have hired Mr. Olson if

he had this information (Testimony of Brown pp. 17-18).

49.     Mr. Brown testified that he would defer to a doctor as to whether or not Plaintiff

was fit for duty. Despite Brown's testimony and in fact, the employment exam of October 18,

2005, was not a preemployment physical which was a part of the preemployment packet

Defendant utilizes, as Plaintiff was hired by the Defendant on August 17, 2005 (See No. 2

above).  In addition, Plaintiff sustained a work accident while working for the Defendant on

September 26, 2005, which necessitated leaving the vessel on September 29, 2005 (See No 4

above).  Furthermore, it is likely that Plaintiff underwent the Merchant Mariner Physical

Examination on October 18, 2005, so that he could return to work following the September 2005

incident or to renew his Merchant Mariner's license, and he rejoined the vessel on November 11,

2005 (See Affidavit of Shaunne Olson dated December 14, 2007 and No. 3 above).

50.     Captain George Baker testified at the Evidentiary Hearing in this matter that

even on shore leave, Plaintiff Shaunne Olson was subject to the call of the ship and was acting in

the service of the vessel (See Hearing testimony of Captain Baker).

51.     Captain Baker testified that Mr. Olson reported to him that he hurt his back

getting off a stool watching a kick-boxing match on shore leave  (See Hearing testimony of

Captain Baker).

52.     Plaintiff requested from Defendant full and complete copies of any and all

Merchant Mariner Physical Examination Reports (i.e. preemployment physicals) maintained by

the Defendant for the last three years where mariners have indicated on their examination report

that they suffered from problems with their musculoskeletal system, impaired range of motion or

back pain or back injury.  In addition, Plaintiff requested that Defendant produce the name, last

known address and phone numbers of said individuals.  Counsel requested this subsequent to the

Evidentiary Hearing in this matter, and Defendant timely responded to Plaintiff's Request by

stating that the Request sought confidential information which violated the privacy rights of the

individuals in question, and that secondly, the Request was burdensome as all files of the

employees are maintained by the names of the individuals which required searching the entirety

of the files of all employees.  As such, Plaintiff would request a negative inference be granted

Plaintiff and that if Defendant had answered the Request for Production of Documents, it could

be assumed that such response would be in Plaintiff's favor and against Defendant's interests

(See Notice of Plaintiff of Filing Response of Defendant to Plaintiff's Supplemental Request for

Production of Documents with attachment filed in this matter).

53.     Plaintiff testified in this matter that he told Kevin Bradley he felt a twinge in his

back when he got up to go to the bathroom at a kick-boxing match while on shore leave (Olson

deposition p. 61).

54.     Mr. Olson testified that upon arriving back at his hotel early in the morning,

he woke up to get a drink of water and as he stepped out of bed he felt excruciating pain in his

back.  As a result he called Kevin Bradley (Olson deposition p. 63).

55.    Mr. Olson testified that the Captain came to his hotel room and asked what he did that day because he was in such excruciating pain, and Mr. Olson testified that he could not think straight and he could not remember.  However, Kevin Bradley who was standing next to him then proceeded to say, "Shaunne lifted the welder with me at the end of the day." (Olson deposition p. 101).

56.    On or about May 25, Plaintiff testified that he assisted some other crewmembers lifting a welder ten feet weighing 100-200 pounds, out of the forward port void with a rope. Later that night he noticed a twinge in his lower back when getting off a stool, and around 2:30 a.m. the following morning when he went to get a drink of water he could not walk because of the excruciating back pain (Affidavit of Shaunne Olson dated January 17, 2007).

57.    Mr. Olson testified with regards to his shore leave in Thailand.  Mr. Olson was specifically asked if something had happened on the ship where he received a call to return to the ship, while he was at the bar, would he be subject to the call while he was in a bar, and Mr. Olson responded 'yes' (Olson deposition pp. 117-118).

58.    Mr. Olson testified that all the information in the Affidavit he supplied with respect to his bills and cost of living, etc., were accurate and correct to the best of his knowledge. The Affidavit and bills submitted by Mr. Olson reflected the following:

- ▸ Consumers Power $134.53/month
- ▸ Electric bill from DTE averaged $38.28/month
- ▸ Water and sewer bill from City of Cheboygan averaged $48.54/month
- ▸ Basis telephone $89.28/month
- ▸ House taxes ($1,075.46/summer; $316.17/winter) for an average of $115.13/month
- ▸ Homeowner's insurance ($602.00 per year) for an average of

14

$50.17/month
‣   Land contract $563.58/month
(Olson deposition pp. 118-121; see Exhibit A attached to Plaintiff's Brief in Support of Motion for Maintenance and Cure).

Defendant has not presented any evidence either medical or with respect to his expenses, to refute

the information submitted by Plaintiff.

59.     United States Department of Agriculture official USDA Food Plans: costs of

foods at home United States average for June 2006, which is the month Mr. Olson left the vessel

indicates that a male 20-50 years of age on a liberal plan would spend $288.60 on the monthly

cost of food.  This number equates to less than $10.00 per day (Evidentiary Hearing Exhibit List,

Exhibit S).

60.     On or about May 25 or 26, 2006, Plaintiff was taken by ambulance from his

hotel room to a hospital for back pain (Stipulated by parties at the time of Evidentiary Hearing).

61.     On June 13, 2006, Plaintiff was discharged from the vessel in Okinawa, Japan

(Exhibit B to Plaintiff's Brief in Support of Motion for Maintenance and Cure; Request for

Admission No. 2).

62.     On June 19, 2006, Plaintiff saw Dr. Michael Florek relating a history of a May

25, 2006, injury to his low back after lifting a welder and was diagnosed with lumbar strain and

spasm (Exhibit C to Plaintiff's Brief in Support of Motion for Maintenance and Cure; Request

for Admission No. 3).

63.     On July 31, 2006, Plaintiff's counsel at that time, wrote Defendant seeking

payment of maintenance and cure which Defendant never responded to (Exhibit D to Plaintiff's

Brief in Support of Motion for Maintenance and Cure; Request for Admission No. 4).

15

64.     In July 2006, Plaintiff underwent physical therapy for his back (Exhibit E to Plaintiff's Brief in Support of Motion for Maintenance and Cure; Request for Admission No. 5).

65.     On August 9, 2006, Plaintiff saw Dr. Robert Kenney who referred him for a lumbar MRI which demonstrated:

> ▸     Moderate sized left paracentral disc herniation, L4/L5 with caudally extruded disc fragment extending at approximately 1 cm into the spinal canal
> ▸     Moderate central disc bulging at L5/S1 level
> ▸     Mild central disc bulging at L3/L4
> (Exhibits F and G to Plaintiff's Brief in Support of Motion for Maintenance and Cure; Request for Admission No. 6)

66.     On November 1, 2006, Plaintiff counsel wrote defense counsel  inquiring as to whether maintenance was going to be paid voluntarily (Exhibit J to Plaintiff's Brief in Support of Maintenance and Cure; Request for Admission No. 7).

67.     On November 8, 2006, Mr. Olson saw neurosurgeon David L. Morris who wanted another MRI (Exhibit H attached to Plaintiff's Brief in Support of Motion for Maintenance and Cure; Request for Admission No. 8).

68.     On November 30, 2006, Dr. Morris performed a left L4/5 medial facetectomy and excision of herniated nucleus pulposis and left L5/S1 medial facetectomy and excision of osteophytic spur (Exhibit I attached to Plaintiff's Brief in Support of Motion for Maintenance and Cure; Request for Admission No. 9).

69.     On November 15, 2006, defense counsel responded to undersigned's November 1, 2006, correspondence replying that:

> "I am in receipt of your letter dated November 1, 2006; however,

some minimal investigation into your client's claim for maintenance and cure will first have to be made.  Receipt, therefore of the above-mentioned executed authorization would be most helpful (Exhibit

K to Plaintiff's Brief in Support of Motion for Maintenance and Cure; Request for Admission No. 10).

70.     The above-referenced authorizations were promptly executed by Plaintiff and mailed to Defendant on November 22, 2006, and admittedly received by defense counsel on November 27, 2006 (Request for Admission No. 11).

71.     On December 4, 2006, Dr. Morris' November 8, 2006 (Exhibit H) record was sent to Defendant by Plaintiff counsel (Exhibit L to Plaintiff's Brief in Support of Motion for Maintenance and Cure; Request for Admission No. 12).

72.     Even though maintenance and cure was first requested in the summer of 2006, Defendant has failed to pay Plaintiff the maintenance and cure to which he is entitled thereby driving Plaintiff into financial destitution (Affidavit of Shaunne Olson dated January 17, 2007; Request for Admission No. 13).

**CONCLUSIONS OF LAW**:

1.     Maintenance and cure is payable for injuries or illness incurred in the service of the ship on or off the vessel except where the conduct giving rise to the injury or illness constitutes willful misconduct.  Warren v United States, 340 U.S. 523 (1951); accord., *Sobieski v Ispat-Inland, Inc.*, 413 F.3d 628, 630 (7th Cir. 2005).

2.     Maintenance is the payment by a shipowner to a seaman for the seaman's food and lodging expenses incurred while he is ashore as a result of illness or accident. *Clifford v Mt. Vernon Barge Service, Inc.,* 127 F.Supp 2nd 1055 (S.D. Ind. 1999); *Frost v Teco Barge Lines,*

17

2005 WL 1389118 (S.D. Ill.).

3.      Preliminary injunctions are an appropriate vehicle for enforcement of that obligation. *Bolding v Hunter Marine Transport, Inc.*, 2006 WL 938943 (W.D. Ky.); *Thornsberry v Nugent Sand Co.*, 2003 WL 23164408 (W.D. Ky.).

4.      Seamen injured in the course of their employment are entitled to maintenance and cure benefits until they reach the point of maximum cure. *Breese v AWI, Inc.*, 823 F.2d 100, 104 (5th Cir. 1987). Maximum cure is the point at which no further improvement in the seaman's medical condition is reasonably expected. *Farrell v United States*, 336 US 511, 518, 69 S.Ct. 707, 711 (1949). Generally, the obligation to provide maintenance and cure ends when a doctor provides a qualified medical opinion that plaintiff has reached maximum possible cure. *Breese*, 83 F.2d at 104-05.

5.      Preliminary injunctions are an appropriate vehicle for enforcement of that obligation. *Bolding v Hunter Marine Transport, Inc.,* 2006 WL 938943 (W.D. Ky.); *Thornsberry v Nugent Sand Co.*, 2003 WL 23164408 (W.D. Ky.).

6.      Even though first requested last summer, Defendant has failed to pay Plaintiff the maintenance and cure to which he is entitled thereby driving Plaintiff into financial destitution. The payment of maintenance and cure is supposed to be prompt. *Vella v Ford Motor Co.*, 421 U.S. 1, 4 (1975).

7.      In order to recover maintenance a seaman must produce evidence to the court that is sufficient to provide an evidentiary basis for the court to estimate his actual costs. *Hall v Nobel Drilling, Inc.*, 242 F.3d 582, 590 (5th Cir. 2001). Provided he has incurred the expenses, the seaman is entitled to the reasonable cost of food and lodging. *Id*. a t 587. A seaman's burden

of production in establishing the value of maintenance is feather-light: his own testimony as to reasonable cost of room and board in the community where he is living is sufficient to support an award.  *Yelverton v Mobile Laboratories, Inc.*, 72 F.2d 555, 558 (5th Cir. 1986).  Lodging encompasses those expenses necessary to the provisions of habitable housing including heat, electricity, home insurance, and real estate taxes.  *Gillikin v United States*, 764 F.Supp. 270, 273 (E.D.N.Y. 1991); *Hall v Noble Drilling, Inc.*,  242 F.3d 582 at 587, n. 17 (5th Cir. 2001).

8.     A seaman makes out *prima facie* case on the maintenance rate question when he proves the actual living expenditures which he found it necessary to incur during his convalescence experience.  Once he has done so, the burden shifts to the defendant to produce some evidence in rebuttal.  *Clifford v Mt. Vernon Barge Service, Inc.*, 127 F.Supp.2d 1055, 1057 (S.D. Ind. 1999).

9.     In *Miller v Canal Barge Co., Inc.*, 2000 WL 3389203 (E.D. La. 2000), the court held that plaintiff's affidavit and receipts of actual living expenses were sufficient to establish a *prima facie* showing as to the appropriate maintenance.

10.     A seaman who is injured during a period of relaxation while on shore leave is injured in the "service of the ship" so as to be entitled to maintenance and cure; that proposition has been well established for more than half a century.  *Warren v United States*, 340 U.S. 523 (1951); *Aguilar v Standard Oil Co.*, 318 US 724, 63 S.Ct. 930, 876 L.Ed. 1107 (1943).

11.     Any ambiguities in determination of whether or not maintenance and cure is payable are to be resolved in Plaintiff-seaman's favor.  *Hughes v Hunter Marine Transport, Inc.,* 1997 WL 834547 (M.D. Tenn. 1997); *Warren v Atkinson*, 369 US 527 at 532 (1962).

12.     Wilful concealment of a disabling condition is an affirmative defense which

needs to be pled pursuant to FRCP 12(b).  In this case, Defendant has never pled or sought to amend their affirmative defenses to include the defense of wilful concealment of disabling condition.  Instead, Defendant showed up at the evidentiary hearing held in this matter, approximately 10-11 months after Plaintiff's Motion for Maintenance and Cure was filed with the 11th hour defense.  As such, Defendant's defense of wilful concealment of disabling condition was never pled, is not properly before the Court, and therefore should be denied.

13.     In the alternative only, a seaman's wilful concealment at the time of employment of a disabling condition may provide a defense to maintenance and cure for disabilities related to the same condition.  *McCorpen v Central Gulf S.S. Corp.*, 396 F.2d 547 (5th Cir. 1968).

14.     In order to establish the defense of "wilful concealment", an employer must show that: (1) the claimant intentionally misrepresented or concealed medical facts concerning a prior injury or condition; (2) the non-disclosed facts were material to the employer's decision to hire the claimant, and; (3) a connection exists between the withheld information and the injury complained of in the lawsuit.  *Brown v Parker Drilling Offshore Corp.*, 2005 US App.Lexus 125 (5th Cir. 2005).

15.     *Britton v U.S.S. Great Lakes Fleet, Inc.*, 302 F.3d 812 (8th Cir. 2002), involved a deckhand who had suffered injury to his back a few weeks prior to his employment.  He indicated on his medical history form that he had suffered previous back strain, but checked 'no' where back injury and disc disease were listed.  Another two years after he commenced employment, he sustained an injury to his back opening a stairwell cover that required 160 pounds of force lift.  The trial court granted summary judgment in favor of the employer on the grounds that failure of a seaman applicant to disclose the exact nature of his prior back injury

20

rendered him ineligible for maintenance and cure.  The Eighth Circuit reversed on the grounds that it was a jury issue whether the employer proved it would not have hired the plaintiff if he had fully disclosed the medical facts of his prior back injury.

16.     In *Burkert v Weyerhauser S.S. Co.*, 350 F.2d 826 (9th Cir. 1960), the court held that a seaman who has a good faith belief that he is fit for duty will not be denied maintenance and cure when he is not directly asked about the preexisting condition.  A good faith belief on the part of the seaman that he was fit for duty avoids the defense.  *Sammon v Central Gulf S.S. Corp.,* 442 F.2d 1018 (2nd Cir. 1971).  In *Ruiz v Plimsoll Marine, Inc.*, 72 F.Supp. 315 (N.D. La. 1992), the court held that a seaman who was able to perform his duties for years after a prior injury did not wilfully fail to disclose a prior disability.

17.     In *Deisler v McCormack Aggregates Co.*, 54 F.3d 1074 (3rd Cir. 1995), the court held that non-disclosure of a preexisting injury, without more, will not result in a seaman's loss of maintenance and cure.  Such a forfeiture will not occur unless plaintiff intentionally misrepresented or concealed medical facts that were material to the decision to hire plaintiff.  In addition, there must be a nexus between the improperly concealed material information and the disputed injury.

18.     *Smith v Apex Towing Co.*, 949 F.Supp. 667 (N.D. Ill. 1997), made it clear that "materiality" required some proof that disclosure of the true medical status would have effected the decision to hire.

19.     The shipowner has the burden of proving its defenses.  *Gulledge v United States,* 337 F.Supp. 1108 (E.D. Pa. 1972).

20.     Defendant has not affirmatively come forward with any evidence showing that

21

they would not have hired Plaintiff if they knew his full medical background.  In addition, Defendant has not produced any evidence that Plaintiff's current medical condition is related to any prior conditions, or that Plaintiff was not fit for duty when hired.

21.     Attorney fees can be awarded if the shipowner was callous and recalcitrant in its wilful and persistent refusal to pay maintenance and cure which plainly owed.  *Stephens v McGinnis, Inc*., 82 F.3d 1353, 1360 (6th Cir. 1996).

22.     Defendant's failure to make any prompt, good faith investigation of Plaintiff's claims for maintenance and cure entitles Plaintiff to an attorney fee as a result thereof.  *Ray v Jantran, Inc*., 2001 WL 1911358 (E.D. Ark.).  In *Ray*, the court held that the defendant did not make any prompt, good faith investigation of plaintiff's claims for maintenance and cure, which only would have required it to investigate whether plaintiff was in the service of his ship at the time his injury occurred.  In addition, *see Sullivan v Tropical Tuna, Inc.*, 963 F.Supp. 42, 45 (D. Mass. 1997), where the court held that defendant's one month delay in authorizing payment for plaintiff's surgery constituted wilful failure to provide cure warranting an award of attorney fees.

23.     On July 31, 2006, Plaintiff's predecessor counsel wrote Defendant seeking payment of maintenance and cure.

24.     On October 23, 2006, Plaintiff counsel filed a Complaint against the Defendant alleging a cause of action under the Jones Act, as well as the General Maritime Law for unseaworthiness and for maintenance and cure.

25.     On November 1, 2006, Plaintiff's attorney wrote defense counsel inquiring as to whether or not maintenance and cure was going to be paid voluntarily.  On November 22, Plaintiff's sent executed medical authorizations to defense counsel.

22

26.     On January 9, 2007, Defendant filed its Answer and Affirmative Defenses to Plaintiff's Complaint and did not allege wilful concealment of a disabling condition as an affirmative defense.

27.     On January 19, 2007, Plaintiff filed his Motion for Maintenance and Cure in this matter, along with Brief in Support.

28.     On March 26, 2007, Plaintiff filed a copy of his Motion for Maintenance and Cure and Brief in Support to defense counsel by U.S. mail per the Court's Order.

29.      On May 10, 2007, Defendant filed a Response in Opposition to Plaintiff's Motion for Maintenance and Cure stating as their basis for not paying that Plaintiff's injury did not occur while he was on duty or working on the vessel.

30.     On May 14, 2007, Plaintiff filed a Reply in Support of Motion for Maintenance and Cure.

31.     On September 25, 2007, Defendant filed Sur-Reply regarding Motion for Maintenance and Cure.

32.     This Court finds that Plaintiff is entitled to an award of maintenance and cure, as maintenance and cure is payable for injuries or illnesses incurred in the service of the ship on or off the vessel.  *Warren v United States*, 340 US 523 (1951); accord, *Sobieski v Ispat-Inland, Inc*., 413 F.3d 628, 630 (7th Cir. 2005).

33.     This Honorable Court finds that Plaintiff has submitted such sufficient *prima facie* proof of expenses to entitle him to an award of maintenance, and Defendant has neither denied or presented any evidence to rebut Plaintiff's figures and as such, this Honorable Court shall accept the numbers indicated by Plaintiff in Plaintiff's Motion, Affidavit in support thereof,

23

and attached to Plaintiff's deposition testimony.

34.     Specifically, this Honorable Court finds that Plaintiff on average incurs expenses of $1,328.11 per month so as to be entitled to a daily award of maintenance in the amount $44.27.  Plaintiff has not received any maintenance since leaving vessel on June 13, 2006, and therefore Plaintiff is owed maintenance from June 14, 2006 through December 19, 2007, the date of the Settlement Conference in this matter which constitutes 553 days for a grand total of $24,481.31, with maintenance continuing thereafter at the rate of $44.27 per day.

35.     This Court further finds that the Defendant in this case did not make any prompt, good faith investigation of Plaintiff's claim for maintenance and cure, which would have only required it to investigate whether Plaintiff was in the service of his ship at the time his injury occurred.  As such, Plaintiff is entitled to an award of attorney fees.  Plaintiff counsel is given 21 days from the signing of any Order to submit a Bill of Costs with respect to the attorney fees owed.

36.     This Honorable Court finds the Defendant has never properly pled a wilful concealment defense as an affirmative defense in this matter, and therefore it is stricken.  In the alternative, this Honorable Court finds that Defendant is not entitled to a wilful concealment of a preexisting physical disability which would lead to a denial of maintenance and cure in this matter, as Defendant never required a pre-employment physical as a part of its hiring process of Plaintiff in this case.  The Pre-Employment Physical Report to which Defendant contends there was wilful concealment of preexisting disabilities was not a pre-employment physical, but was a physical exam which was filled out by Plaintiff's physician after he had already been employed by the Defendant, and therefore any potential non-disclosed facts could not have been material to

24

the Defendant's decision to hire the Plaintiff and the Defendant cannot demonstrate that they would not have hired the Plaintiff had they known of the alleged facts at the time the hiring decision was made.  Furthermore, Defendant did not establish nor have they produced any evidence that Plaintiff's alleged prior injuries caused or were in any way related to his accident and consequent back injury and need for surgery.  As such, Defendants are not allowed to rely on a *McCorpen* defense for denial of maintenance and cure.   Finally, the Physical Examination Report of Dr. Florek which Defendant takes issue with, was actually filled out by the doctor who admitted he read it wrong, and therefore Plaintiff could not have intentionally or deliberately lied about his prior medical history as the doctors asked the wrong questions, and it still had no bearing on Defendant's decision to hire, because as of October 18, 2005, Plaintiff was already employed.

Respectfully submitted,

O'BRYAN BAUN COHEN KUEBLER

/s/ Howard M. Cohen

_____
Howard M. Cohen (P41346)
Attorney for Plaintiff
401 S. Old Woodward, Ste. 450
Birmingham, MI 48009
(248) 258-6262
(248) 258-6047
hcohen@obryanlaw.net

DATED:      December 17, 2007

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that on the 17th day of December, 2007 the foregoing was filed using the Court's ECF Filing System and will be served through the Court's ECF system and will also be served via first class mail, postage prepaid, upon the following attorney of record:

Stephanie R. Miller, Esq.
One Riverfront Plaza
Suite 602
Louisville, KY  40202

/s/ Howard M. Cohen

_____